UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MATIS NAYMAN, derivatively on behalf of ELECTRIC LAST MILE SOLUTIONS, INC. F/K/A FORUM MERGER III CORPORATION, | Case No.: |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| vs. | |
| JAMES TAYLOR, JASON LUO, DAVID BORIS, MARSHALL KIEV, ALBERT LI, ROBERT SONG, STEVEN BERNS, NEIL GOLDBERG, RICHARD KATZMAN, BRIAN M. KRZANICH, JEFFREY NACHBOR, SHAUNA F. MCINTYRE, and RICHARD N. PERETZ, | **JURY DEMAND** |
| Defendants, | |
| and | |
| ELECTRIC LAST MILE SOLUTIONS, INC. F/K/A FORUM MERGER III CORPORATION, | |
| Nominal Defendant. | |

Plaintiff, Matis Nayman, by his undersigned attorneys, brings this stockholder

derivative action on behalf of nominal defendant Electric Last Mile Solutions, Inc.

("ELMS" or the "Company") f/k/a Forum Merger III Corporation against certain

current and former members of the Company's Board of Directors for their breaches

1

of fiduciary duties, violations of federal securities laws, and other misconduct that resulted in material damage to the Company and its stockholders. These allegations are made upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief based upon the investigation and analysis by Plaintiff's counsel, including, among other things, a review of the Company's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, news reports, financial analyst reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant ELMS against certain of its current and former officers and directors for their breaches of fiduciary duty and violations of the federal securities laws that resulted in material damage to the Company and its stockholders.

2.    ELMS is an electric vehicle manufacturer headquartered in Troy, Michigan. The Company, originally known as Electric Last Mile, Inc. ("ELMI"), was co-founded in August 2020 by Defendants James Taylor ("Taylor") and Jason Luo ("Luo"). A few months later, in December 2020, ELMI announced that it would

merge with Forum Merger III Corporation ("Forum"), a special purpose acquisition company ("SPAC") created for the purpose of raising capital through an initial public offering[1] and using the capital infusion to acquire an existing company. In June 2021, the Merger was completed and the Company changed its name to Electric Last Mile Solutions, Inc. ("ELMS").

3.  In numerous public filings, the Company represented that its internal controls over financial reporting and director compensation were adequate and that its financial statements were truthful, accurate, and complete. In fact, the Company's financial statements were rife with material misstatements and omissions at the time they were made, resulting from the Individual Defendants' utter failure to maintain an effective system of internal controls over financial reporting. Indeed, on February 1, 2022, ELMS disclosed that a Special Committee formed by the Board in November 2021 concluded that Defendants Taylor and Luo had purchased Company equity at substantial discounts to market value without disclosure and without obtaining an independent valuation (the "Improper Equity Transactions"), together with certain other ELMI executives in November and December 2020, shortly before the announcement of the Merger. The failure to account for these discounted purchases, ELMS disclosed, rendered the Company's previously reported financial

---

[1]  Forum completed its initial public offering on August 21, 2020, netting gross proceeds of $250 million.

statements materially false and misleading and required their restatement. The Company further disclosed a material weakness in its internal controls over financial reporting. In the face of these startling findings, Defendants Taylor and Luo had "resigned" their positions with the Company.

4.      One week later, ELMS disclosed that the Company's external auditor, BDO LLP ("BDO"), resigned over disagreements regarding BDO's independence, which appeared to be seriously compromised as a result of its involvement with the Improper Equity Transactions, as well as the Company's handling of Taylor and Luo's misconduct.

5.      On March 11, 2022, in a Current Report on Form 8-K filed with the SEC (the "March 11, 2022 8-K"), the Company's new leadership announced a comprehensive review of the status of the Company's products and commercial plans, which resulted in delays in vehicle production. The Company subsequently withdrew all previous financial guidance and estimates because of the continuing material weakness in controls over financial reporting.

6.      The Company further reported that the SEC had opened an investigation into the Improper Equity Transactions and the disagreements with BDO. The Company also reported a serious cash flow problem and later announced a planned 24% reduction in its workforce.

7.     Soon thereafter, the Company provided the SEC and investors with notifications of its inability to timely file an annual report for fiscal year 2021 and a quarterly report for the first quarter of 2022.

8.     ELMS's stock price dropped precipitously in the wake of these shocking disclosures, leading to aggrieved investors' filing of securities class action lawsuits against the Company, Defendants Taylor and Luo, and several of the Individual Defendants. As such, the Company is now subject to substantial liability and will be forced to expend substantial sums to defend itself and its officers and/or directors.

9.     As a result of the Individual Defendants' breaches of fiduciary duty, ELMS has sustained substantial damages and irreparable injury to its reputation. Through this action, Plaintiff seeks to recover for the Company its damages and remediate the control weaknesses that plague ELMS.

10.     Plaintiff did not make a demand prior to bringing this action because it would be futile. The Company's directors are neither disinterested nor independent. In the absence of this action, ELMS will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.     JURISDICTION AND VENUE

11.    This Court has jurisdiction over the claims asserted herein for violations of Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1) and 15 U.S.C. §§ 78j(b), and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9, pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

13.    This Court has jurisdiction over the Defendants because each Defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.    Venue is proper in this District where ELMS maintains its principal executive offices pursuant to 28 U.S.C. § 1391 because a substantial portion of the wrongs took place in this District, Defendants transact business in this District, and Defendants' actions have had an effect in this District.

## III.    INDIVIDUAL DEFENDANTS' DUTIES

15.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the

6

Company, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

16.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of ELMS, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with ELMS, each of the Individual Defendants knew material, non-public information pertinent to the Company.

17.    As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on the Nasdaq, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete, and truthful information concerning ELMS's financial condition, operations, products, internal controls, and business prospects. In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's

shares would be based upon accurate information. In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over ELMS's management, policies, and internal controls.

18.     Each of the Individual Defendants also owed to the Company and its shareholders the duty of loyalty requiring that they prioritize ELMS's interest and that of its shareholders over their own interests and refrain from using their position, influence, or insider knowledge of the affairs of the Company to gain personal advantage.

19.     At all times relevant hereto, the Individual Defendants were the agents of each other and ELMS and were always acting within the course and scope of such agency.

20.     The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at ELMS.

**A.     Additional Duties Under The Corporate Governance Guidelines**

21.     The Company's Corporate Governance Guidelines, lay out the responsibilities of the Board, which include, inter alia:

- Overseeing the conduct of the Company's business, to evaluate whether the business is being properly managed;

- Reviewing and, where appropriate, approving the Company's major financial objectives, plans and actions;

- Reviewing and where appropriate, approving major changes in, and determinations of other major issues respecting, the appropriate auditing and accounting principles and practices to be used in the preparation of the Company's financial statements;

- Annually evaluating the performance and approving the compensation of the CEO and other senior officers;

- Reviewing and where appropriate, approving actions to be undertaken by the Company that would result in a material change in the financial structure or control of the Company, the acquisition or disposition of any businesses or asset(s) material to the Company or the entry of the Company into any major new line of business; and

- Ensuring that the Company's business is conducted with the highest standards of ethical conduct and in conformity with applicable laws and regulations.

**B.    Additional Duties Under the Code of Ethics and Business Conduct**

22.    ELMS's Code of Ethics and Business Conduct (the "Code of Conduct") was adopted by the Board and contains guidelines for conducting the business of ELMS "to promote honest and ethical conduct." The Code applies to all directors, officers, and employees.

23.    The Code of Conduct was adopted in order to:

(a)    promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest;

(b)    promote full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company;

9

(c)     promote compliance with applicable governmental laws, rules, and regulations;

(d)     promote the protection of Company assets, including corporate opportunities and confidential information;

(e)     promote fair dealing practices;

(f)     deter wrongdoing; and

(g)     ensure accountability for adherence to the Code.

24.     The Code of Conduct requires honest and ethical conduct:

The Company's policy is to promote high standards of integrity by conducting its affairs honestly and ethically.

Each director, officer, and employee must act with integrity and observe the highest ethical standards of business conduct in his or her dealings with the Company's customers, suppliers, partners, service providers, competitors, employees, and anyone else with whom he or she has contact in the course of performing his or her job.

25.     The Code of Conduct warns about conflicts of interest:

A conflict of interest occurs when an individual's private interest (or the interest of a member of his or her family) interferes, or even appears to interfere, with the interests of the Company as a whole. A conflict of interest can arise when an employee, officer, or director (or a member of his or her family) takes actions or has interests that may make it difficult to perform his or her work for the Company objectively and effectively. Conflicts of interest also arise when an employee, officer, or director (or a member of his or her family) receives improper personal benefits as a result of his or her position in the Company.

Where a director, officer, employee, or a family member of a director, officer, or employee directly or indirectly holds a substantial financial or other interest in any business or organization with which the Company has business dealings, such as a customer, other business partner, or competitor, or if a director, officer, or employee or their

10

family could benefit from transactions with the Company, a conflict of interest can exist. A financial interest is improper if a director, officer, or employee's position, the amount of the investment or the particular company in which a director, officer, or employee invested could influence or appear to influence a director, officer, or employee's actions on behalf of the Company. A director, officer, or employee's personal financial interests in these situations are of concern because of a director, officer, or employee's ability to influence the decisions of the Company, the potential to influence the decisions of the other company, and a director, officer, or employee's access to confidential information of the Company or the other company.

26.     The Code of Conduct mandates truthful, accurate and complete disclosure of the Company's financial condition and business prospects:

> The Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules.
>
> Each director, officer, and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each director, officer, and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.
>
> Each director, officer, and employee who is involved in the Company's disclosure process must: (a) be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and (b) take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely, and understandable disclosure.

27.     The Code of Conduct states that "[a]ll directors, officers, and employees should protect the Company's assets and ensure their efficient use. Theft,

carelessness and waste have a direct impact on the Company's profitability and are

prohibited."

28.    The Code of Conduct prohibits the trading of securities while in

possession of material nonpublic information:

> No director, officer or employee may purchase or sell any Company
> securities while in possession of material nonpublic information
> regarding the Company, nor may any director, officer, or employee
> purchase or sell another company's securities while in possession of
> material nonpublic information regarding that company. It is against
> Company policies and illegal for any director, officer, or employee to
> use material nonpublic information regarding that Company or any
> other company to obtain profit for himself or herself; or directly or
> indirectly "tip" others who might make an investment decision on the
> basis of that information.

29.    The Code of Conduct details the personal conduct required by ELMS

directors and officers:

> All directors, officers, and employees are expected to conduct
> themselves in a manner that reflects positively on the Company's
> reputation and public image. Each director, officer, and employee helps
> the Company maintain its excellent reputation by maintaining his or her
> personal reputation for excellent ethics, legal compliance, fair and
> honorable treatment of others, and quality in all he or she does.

30.    The Code of Conduct provides:

> The Company may face incidents, or public allegations or criticisms
> that can result in people or entities outside of the Company believing
> that the Company or its people have done something wrong or harmful.
> This can cause the Company or its people to suffer significant financial
> harm or loss; damage to the reputation of, or loss of confidence in, the
> Company, its products and services or its senior leadership . . . If the
> Company, its people, products, services or property are causing or

could cause harm or damage of some sort, directors, officers, and employee must promptly report the problem to enable us to minimize the potential harm or damage to the public. Negative allegations or actions against the Company can take many forms, including: reports of illegal or criminal acts such as misappropriations of corporate funds or violations of laws or regulations . . . criticism by government officials or regulators; lawsuits and regulatory or government investigations; news stories alleging the above or critical of the Company . . . Directors, officers, and employees are expected to be alert to incidents or reports of situations where the Company is accused of wrongdoing, illegal, or unethical acts, of causing harm or damage or other negative reports.

## C. Additional Duties of the Members of the Audit Committee

31. The members of the Company's Audit Committee have additional duties outlined in the Audit Committee Charter, including requirements that its members:

- The Committee shall be directly responsible for the appointment, compensation, retention, replacement and oversight of the work of the independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor shall report directly to the Committee. Annually, the Committee will review the qualifications of the Company's current independent auditor, and select the Company's independent auditor for the next year, subject to stockholder ratification if required or sought;

- The Committee shall, at least annually, review the qualifications, performance, ***independence***[2] (consistent with SEC requirements) and quality control procedures of the independent auditor and the experience and qualifications of the independent

---

[2] All emphasis herein has been added unless otherwise specified.

auditor's senior personnel that are providing audit services to the Company;

- The Committee shall obtain and review a report prepared by the independent auditor describing: (a) the independent auditor's internal quality-control procedures; (b) any material issues raised by the most recent internal quality control review, or peer review, of the independent auditor, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the independent auditor and any steps taken to deal with such issues; and (c) *all relationships between the independent auditor and the Company to assess the independent auditor's independence.* The Committee shall ensure that the independent auditor prepare and deliver, at least annually, a written statement delineating all relationships between the independent auditor and the Company, consistent with applicable PCAOB requirements. *The Committee shall actively engage in a dialogue with the independent auditor with respect to any disclosed relationships or services that, in the view of the Committee, may impact the objectivity and independence of the independent auditor. If the Committee determines that further inquiry is advisable, the Committee shall take appropriate action in response to the independent auditor's report to satisfy itself of the auditor's independence*;

- Discuss[]with management and the independent auditor the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies;

- Discuss[]with management and the independent auditor any correspondence from or with regulators or government agencies, any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process, accounting policies or internal audit function;

- The Committee shall review and discuss with management and the independent auditor: (a) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (b) any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements; and (c) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements;

- The Committee shall review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;"

- The Committee shall review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;

- Discuss[] with the Company's internal or outside counsel any legal matters brought to the Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements;

- Discuss[] with management the Company's significant financial risk exposures as well as information security and technology risks (including cybersecurity) and the actions management has taken to limit, monitor, or control such exposures; providing the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements;

15

- The Committee shall review all related party transactions (meaning transactions required to be disclosed pursuant to Item 404 of Reg. 5-K) on an ongoing basis and all such transactions shall require approval by the Committee;

- Review[] and discuss the Company's disclosure controls and procedures, and the quarterly assessments of such controls and procedures by the Company's principal executive officer and principal financial officer;

- Review[] disclosures regarding the Company's internal control over financial reporting made to the Committee by the Company's principal executive officer and principal financial officer during their certification process for the Annual Report on Form 10-K and Quarterly Report on form 10-Q, including any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls; and

- The Committee, through its Chair, shall report regularly to, and review with, the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditor, the performance of the Company's internal audit function or any other matter the Committee determines is necessary or advisable to report to the Board.

32.     The Audit Committee Charter provides that "[e]ach Committee member shall also satisfy the independence requirements of NASDAQ Stock Market and Rule 10A-3(b)(1) under the Securities Exchange Act of 1934, amended. Each Committee member must be able to read and understand fundamental financial statements, including a company's balance sheet, income statement and cash flow

statement… [i]n addition, at least one member of the Committee shall be an "audit committee financial expert" within the definition adopted by the [SEC.]"

### D. Additional Duties of the Members of the Nominating and Corporate Governance Committee

33. The members of the Company's Nominating and Corporate Governance Committee have additional duties outlined in the Nominating and Corporate Governance Committee Charter, including requirements that its members:

- Review the performance of each current director and shall consider the results of such evaluation when determining whether or not to recommend the nomination of such director for an additional term;

- Recommend the removal of a director for cause, in accordance with the applicable law, provisions of the Company's certificate of incorporation, by-laws and any Corporate Governance Guidelines;

- Oversee the implementation and monitoring of compliance with the Company's Code of Business Conduct other than with respect to matters involving auditing and accounting issues . . . ;

- Consider, develop and recommend to the Board such policies and procedures approved by the Board of Directors on July 13, 2021 with respect to the nomination of directors or other corporate governance matters as may be required or required to be disclosed pursuant to any rules promulgated by the Securities and Exchange Commission or otherwise considered to be desirable and appropriate in the discretion of the Committee.

## IV. PARTIES

### A. Plaintiff

34. Plaintiff Matis Nayman has been a shareholder of ELMS since February 1, 2022 and has held ELMS common stock continuously since that time. As such, Plaintiff was a shareholder at the time of the transactions complained of herein.

### B. Defendants

#### 1. Nominal Defendant Electronic Last Miles Solutions, Inc.

35. Nominal Defendant ELMS is incorporated under Delaware Law with its principal executive offices at 1055 W. Square Lake Road, Troy, Michigan 48098. The Company's common stock trades on the Nasdaq Stock Market ("Nasdaq") under the ticker symbol "ELMS," and ELMS's warrants trade on the Nasdaq under the ticker symbol "ELMSW."

#### 2. Individual Defendants

##### a. Defendant Krzanich

36. Defendant Brian M. Krzanich ("Krzanich") has been an ELMS director since the completion of the Merger and he serves as a member of the Audit Committee and Nominating and Corporate Governance Committee. Krzanich has served as ELMS's Chair of the Board since February 1, 2022.

18

### b.    Defendant McIntyre

37.    Defendant Shauna F. McIntyre ("McIntyre") has been an ELMS director since the completion of the Merger. McIntyre was appointed the Company's interim Chief Executive Officer ("CEO") and President on February 1, 2022.

38.    According to the Current Report on Form 8-K filed by the Company with the SEC on February 1, 2022 (the "February 1, 2022 8-K"), Defendant McIntyre receives an annual base salary of $550,000 with a target bonus opportunity equal to 100% of her salary paid with respect to the applicable performance year.[3] Further upon her appointment as CEO and President, McIntyre received a restricted stock unit award with an aggregate value of $12,000,000.

### c.    Defendant Peretz

39.    Defendant Richard N. Peretz ("Peretz") has been an ELMS director since the completion of the Merger and is Chair of the Audit Committee and the Compensation Committee. In February 2020, Defendant Peretz retired as the Senior Vice President, Chief Financial Officer and Treasurer of the United Parcel Service of America, Inc., serving in that position since 2015.

40.    According to the Proxy Statement filed by the Company with the SEC

---

[3]    McIntyre was entitled to receive an amount equal to $300,000, payable in cash and/or common stock of the Company upon expiration of the initial 90-day term of her employment.

on June 9, 2021, Peretz will receive an annual cash retainer of $100,000, an annual grant of restricted stock units valued at $100,000 for his service as a director of ELMS, and cash retainers of $15,000 for his service as Chair of the Audit Committee and Compensation Committee.

### d.   Defendant Goldberg

41.    Defendant Neil Goldberg ("Goldberg") has been an ELMS director since the completion of the Merger and is a member of the Company's Audit Committee and Compensation Committee. Goldberg served as a director of Forum from the time of its IPO until the Merger with ELMI.

42.    Goldberg is entitled to an annual cash retainer of $100,000 and an annual grant of restricted stock units valued at $100,000 for his service as a director of ELMS.

43.    According to the Company's Form S-1/A filed with the SEC on July 30, 2021 (the "July 30, 2021 S-1/A"), Defendant Goldberg is a member of Forum Investors III LLC ("Sponsor")[4] which as of July 21, 2021, beneficially owned 7,071,666 Class A ELMS common shares, representing voting control of 5.7%.[5]

---

[4]    A SPAC sponsor management team forms to raise capital to create a SPAC.

[5]    This figure includes 205,416 private placement shares which it purchased in Forum's IPO.

### e.    Defendant Boris

44.    Defendant David Boris ("Boris") served as Co-CEO, Chief Financial Officer ("CFO"), and as a director of Forum from its inception until the Merger, whereupon he stepped down from his roles as Co-CEO and CFO and continued serving as a director of the merged Company. According to the February 1, 2022 8-K, ELMS removed Defendant Boris as member of the Audit Committee for not qualifying as independent pursuant to Nasdaq Listing Rule 5605(c)(2)(A)(ii). Defendant Boris is a managing member of Forum Capital Management III LLC which is the managing member of Sponsor. Defendant Boris is also a member of Sponsor.

### f.    Defendant Taylor

45.    Defendant Taylor served as the Company's CEO following the Merger until February 1, 2022. Prior to the Merger, Defendant Taylor was ELMI's co-founder and CEO. Defendant Taylor received an annual base salary of $480,000 upon completion of the Merger, and he was also entitled to an annual target bonus opportunity of 100% of base salary.

46.    According to the July 30, 2021 S-1/A, as of July 21, 2021, Defendant Taylor beneficially owned 5,305,598 ELMS common shares, representing voting

control of 4.3%.[6] Given the $9.75 price per share of the Company's common stock at the close of trading on July 21, 2021, Defendant Taylor owned close to $52 million worth of Company stock.

### g.     Defendant Luo

47.     Defendant Luo served as the Company's Executive Chairman following the Merger until February 1, 2022. Prior to the Merger, Defendant Luo was ELMI's co-founder and Executive Chairman. Defendant Luo received an annual base salary of $480,000 upon completion of the Merger, and was also entitled to an annual target bonus opportunity of 100% of base salary.

48.     According to the July 30, 2021 S-1/A, as of July 21, 2021, Defendant Luo beneficially owned 59,291,874 ELMS common shares, representing voting control of 47.8%.[7] Given the $9.75 price per share of the Company's common stock

---

[6]     According to the July 30, 2021 S-1/A, this figure does not include 3,300,000 Earnout RSUs granted to Taylor under the Company's equity based incentive plan, as such Earnout RSUs will not vest within 60 days and will only vest upon the achievement by the Company of certain stock price targets. The figure also does not include another 344,000 shares that may be issued to The Jet Group, LLC (the "Jet Group") after the completion of the Merger. Taylor is the sole member of the Jet Group.

[7]     According to the July 30, 2021 S-1/A, this figure does not include 600,000 Earnout RSUs granted to Luo as part of the Company's equity based incentive plan, as such Earnout RSUs will not vest within 60 days and will only vest upon the achievement by the Company of certain stock price targets. It also does not include another 3,829,500 shares held by entities where Luo is the sole member of those entities.

at the close of trading on July 21, 2021, Defendant Luo owned more than $578 million worth of Company stock.

### h.   Defendant Berns

49.   Defendant Steven Berns ("Berns") served as a director of Forum from its IPO until the Merger.  In addition, Defendant Berns is a member of Sponsor, which as of July 21, 2021, beneficially owned 7,071,666 Class A ELMS common shares, representing voting control of 5.7%.

### i.   Defendant Katzman

50.   Defendant Richard Katzman ("Katzman") served as a director of Forum from its IPO until the Merger. Defendant Katzman is a member of Sponsor, which as of July 21, 2021, beneficially owned 7,071,666 Class A ELMS common shares, representing voting control of 5.7%.

### j.   Defendant Nachbor

51.   Defendant Jeffrey Nachbor ("Nachbor") served as a director of Forum from its IPO until the Merger. Nachbor is a member of Sponsor, which as of July 21, 2021, beneficially owned 7,071,666 Class A ELMS common shares, representing voting control of 5.7%.

### k.    Defendant Kiev

52.    Defendant Marshall Kiev served as the Co-CEO, President, and as a director of Forum from its inception until the Merger. Defendant Kiev is a managing member of Forum Capital Management III LLC , which is the managing member of Sponsor, which as of July 21, 2021, beneficially owned 7,071,666 Class A ELMS common shares, representing voting control of 5.7%. As of July 12, 2021, Kiev directly held 500,000 ELMS common shares. Given the $9.75 price per share of the Company's common stock at the close of trading on July 21, 2021, Defendant Kiev owned close to $5 million worth of Company stock.

53.    Defendants Goldberg, Berns, Katzman, Nachbor, Boris, and Kiev are collectively referred to herein as the "Forum Defendants."

### l.    Defendant Li

54.    Defendant Albert Li ("Li") served as the Company's CFO and Treasurer from June 2021 through November 2021, when he was succeeded by Defendant Robert Song.

55.    According to the July 30, 2021 S-1/A, as of July 21, 2021, Defendant Li beneficially owned 110,088 Company common shares. Given that the price per share of the Company's common stock at the close of trading on July 21, 2021, was $9.75, Defendant Li owned over $1 million worth of Company stock.

56.    Defendant Li received $275,000 per year as ELMI's CFO and Treasurer.

### m.    Defendant Song

57.    Defendant Robert Song ("Song") has served as the Company's CFO and Treasurer since November 2021. From August 10, 2021 to November 5, 2021, he served as the Company's Treasurer, Principal Accounting Officer, Deputy Chief Financial Officer, and Controller. Additionally, he served as ELMI's Vice President of Finance and Controller beginning on April 26, 2021.

58.    According to a Current Report on Form 8-K filed by the Company with the SEC on November 10, 2021, Defendant Song receives an annual base salary of $375,000, and he is eligible to receive an annual target cash bonus equal to 75% of his annual base salary. On August 30, 2021, he received grants of 300,000 restricted stock units under the Company's 2020 equity-based incentive plan, 250,000 time-vesting stock units, and 250,000 performance-vesting restricted stock units. In addition, on August 30, 2021, Song received (i) a grant of 250,000 time-vesting restricted stock units, 33.3% of which will vest on each of January 2, 2022, January 2, 2023, and January 2, 2024, subject to his continued employment with the Company on such vesting dates, and (ii) a grant of 250,000 performance-vesting restricted stock units.

## V.      SUBSTANTIVE ALLEGATIONS

### A.      Background

59.      ELMS is an electronic vehicle manufacturer focused on the commercial space. ELMS produces a cargo delivery van, the Urban Delivery, and a cargo delivery truck, the Urban Utility. According to a study arranged by the Company, over half of the total delivery cost for shipped packages is incurred in the last mile portion of the delivery. The Company's mission is to design, engineer, and manufacture electronic vehicles to provide cost-effective alternatives for customers who "operate in the last mile segment."[8]

60.      ELMS differentiates itself in the electronic vehicles market not only by focusing on the commercial space, but also by configuring existing auto facilities to produce its vehicles, thereby saving itself time and money in production costs.[9]

61.      ELMS was formed from the business combination of Forum Merger III Corporation, a special purpose acquisition company ("SPAC") and ELMI, which was founded in August 2020 by Defendants Taylor and Luo.

---

[8]      *See* the Company's Quarterly Report on Form 10-Q with the SEC for the period ended September 30, 2021 pp. 7, 24.

[9]      *See* Michael Wayland, *Electric Last Mile Shares Plummet to $1 after Company Confirms SEC Probe, CNBC*, March 14, 2022, https://www.cnbc.com/2022/03/14/electric-last-mile-shares-plummet-to-1-after-company-confirms-sec-probe.html and accompanying video.

62.     Forum was incorporated as a SPAC on June 25, 2019.

63.     In August and September 2020, Defendant Luo founded and funded ELMI by causing ELMI to issue 1,000 shares of common stock to Defendant Luo's entity, AJ Capital, Inc., at $10 per share. Defendant Taylor co-founded ELMI.

64.     On August 21, 2020, Forum held its IPO, offering 25 million units, consisting of one share of Class A common stock and one-third of one redeemable warrant of the Company, with each warrant entitling the holder to purchase one share of Class A common stock for $11.50 per share, at $10 per unit, generating gross proceeds of $250 million. At the same time, Forum completed the sale of 741,250 private placement units, of which 616,250 were sold to Forum Investors III LLC, the sponsor of the SPAC, and 125,000 were sold to the IPO underwriters, all at a purchase price of $10 per unit.

65.     Following the IPO, Forum's Co-CEO's Defendants Boris and Kiev began searching for a proper business combination partner.

66.     Discussions concerning a potential business combination began on August 21, 2020, between senior members of ELMI management and Defendant Boris. On September 18, 2020, Forum, and ELMI executed a letter of intent for a proposed business combination, in a transaction valued at $1.3 billion. At that time, Defendant Luo owned, through AJ Capital, Inc., 100% of the issued shares of ELMI.

67.     On December 11, 2020, Forum and ELMI announced they had entered

27

into an agreement to merge, pursuant to which Merger Sub, a wholly-owned subsidiary of Forum, would merge into and with ELMI, with ELMI surviving the Merger.

68.     On June 25, 2021, the Merger between ELMI, Merger Sub, and Forum was completed and Forum changed its name to Electric Last Mile Solutions, Inc. and each ELMI share was exchanged for approximately 800 shares of ELMS.

**B.     ELMS Represents in Its Public Filings That Its Internal Controls Over Financial Reporting Are Adequate**

69.     On November 12, 2020, the Company filed with the SEC its Quarterly Report for the period ended September 30, 2020 (the "3Q20 10-Q"). The 3Q20 10-Q was signed by Defendants Boris and Kiev. Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), Defendants Boris and Kiev certified that the 3Q20 10-Q fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 3Q20 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company.

70.     The financial statements in the 3Q20 10-Q contained the following, among other, information:

FORUM MERGER III CORPORATION
CONDENSED BALANCE SHEETS

| | September 30, 2020 (unaudited) | | December 31, 2019 (audited) | |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets | | | | |
| Cash | $ | 1,814,904 | $ | 19,810 |
| Prepaid expenses | | 191,275 | | — |
| Total Current Assets | | 2,006,179 | | 19,810 |
| | | | | |
| Deferred offering costs | | — | | 62,726 |
| Cash and marketable securities held in Trust Account | | 250,622,847 | | — |
| **Total Assets** | $ | 252,629,026 | $ | 82,536 |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities | | | | |
| Accrued expenses | $ | 37,955 | $ | 1,966 |
| Accrued offering costs | | — | | 57,726 |
| Due to Sponsor | | 94,110 | | — |
| Total Current Liabilities | | 132,065 | | 59,692 |
| | | | | |
| Deferred underwriting fee payable | | 8,750,000 | | — |
| **Total Liabilities** | | 8,882,065 | | — |
| | | | | |
| **Commitments and Contingencies** | | | | |
| | | | | |
| Class A common stock subject to possible redemption, 23,814,696 and none shares at redemption value as of September 30, 2020 and December 31, 2019, respectively | | 238,146,960 | | — |
| | | | | |
| **Stockholders' Equity** | | | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized; none issued and outstanding | | — | | — |
| Class A common stock, $0.0001 par value; 100,000,000 shares authorized; 1,936,554 and none issued and outstanding (excluding 23,814,696 and none shares subject to possible redemption) as of September 30, 2020 and December 31, 2019, respectively | | 193 | | — |
| Class B common stock, $0.0001 par value; 10,000,000 shares authorized; 7,187,500 shares issued and outstanding as of September 30, 2020 and December 31, 2019[(1)] | | 719 | | 719 |
| Additional paid-in capital | | 5,104,360 | | 24,281 |
| Accumulated deficit | | (505,271) | | (2,156) |
| **Total Stockholders' Equity** | | 5,000,001 | | 22,844 |
| **Total Liabilities and Stockholders' Equity** | $ | 252,629,026 | $ | 82,536 |

71.     On March 31, 2021, the Company filed with the SEC its Annual Report on Form 10-K for the fiscal year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K was signed by Defendants Boris, Kiev, Berns, Goldberg, Katzman, and Nachbor. Defendants Boris and Kiev certified that the 2020 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 2020 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company.

72.     The 2020 10-K contained the following, among other, information:

FORUM MERGER III CORPORATION
CONSOLIDATED STATEMENTS OF OPERATIONS

| | Year Ended December 31, 2020 | | For the Period from June 25, 2019 (Inception) Through December 31, 2019 | |
|---|---|---|---|---|
| Formation and operational costs | $ | 3,617,022 | $ | 2,156 |
| **Loss from operations** | | **(3,617,022)** | | **(2,156)** |
| | | | | |
| Other income: | | | | |
| Interest earned on marketable securities held in Trust Account | | 66,590 | | — |
| | | | | |
| **Net loss** | $ | **(3,550,432)** | $ | **(2,156)** |
| | | | | |
| Weighted average shares outstanding of Class A redeemable common stock | | 25,000,000 | | — |
| **Basic and diluted net income per share, Class A** | $ | **0.00** | $ | **0.00** |
| | | | | |
| Weighted average shares outstanding of Class A and Class B non-redeemable common stock [1] | | 6,518,068 | | 6,250,000 |
| **Basic and diluted net loss per share, Class A and Class B non-redeemable common stock** | $ | **(0.54)** | $ | **(0.00)** |

(1)   At December 31, 2019, the weighted average shares outstanding include up to 937,500 shares of Class B common stock forfeited on October 5, 2020 as a result of the expiration of the underwriter's option to exercise their over-allotment (see Note 5).

FORUM MERGER III CORPORATION
CONSOLIDATED BALANCE SHEETS

| | December 31 | | | |
|---|---|---|---|---|
| | 2020 | | 2019 | |
| | (As Restated) | | | |
| **ASSETS** | | | | |
| Current assets | | | | |
| Cash | $ | 1,555,497 | $ | 19,810 |
| Prepaid expenses | | 157,486 | | — |
| Total Current Assets | | 1,712,983 | | 19,810 |
| | | | | |
| Deferred offering costs | | — | | 62,726 |
| Cash and marketable securities held in Trust Account | | 250,066,590 | | — |
| **TOTAL ASSETS** | $ | **251,779,573** | $ | **82,536** |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities | | | | |
| Accrued expenses | $ | 3,329,929 | $ | 1,966 |
| Accrued offering costs | | — | | 57,726 |
| Total Current Liabilities | | 3,329,929 | | 59,692 |
| | | | | |
| Deferred underwriting fee payable | | 8,750,000 | | |
| Warrant liabilities | | 29,859,848 | | |
| **TOTAL LIABILITIES** | | **41,939,777** | | **59,692** |
| | | | | |
| **Commitments and Contingencies** | | | | |
| | | | | |
| Class A common stock subject to possible redemption, 20,483,979 and none shares at redemption value as of December 31, 2020 | | 204,839,790 | | — |
| | | | | |
| **Stockholders' Equity** | | | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized, none issued and outstanding | | — | | — |
| Class A common stock, $0.0001 par value; 100,000,000 shares authorized; 5,257,271 and none issued and outstanding (excluding 20,483,979 and none shares subject to possible redemption) as of December 31, 2020 and 2019, respectively | | 526 | | — |
| Class B common stock, $0.0001 par value; 10,000,000 shares authorized; 6,250,000 and 7,187,500 shares issued and outstanding as of December 31, 2020 and 2019, respectively [1] | | 625 | | 719 |
| Additional paid-in capital | | 34,362,236 | | 24,281 |
| Accumulated deficit | | (29,363,381) | | (2,156) |
| **Total Stockholders' Equity** | | **5,000,006** | | **22,844** |
| **Total Liabilities and Stockholders' Equity** | $ | **251,779,573** | $ | **82,536** |

(1)   At December 31, 2019, the shares issued and outstanding includes 937,500 shares of Class B common stock forfeited on October 5, 2020 as a result of the expiration of the underwriter's option to exercise their over-allotment (see Note 6).

FORUM MERGER III CORPORATION
CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Stock Subscription Receivable from Stockholder | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance – June 25, 2019** | — | $ — | — | $ — | $ — | $ — | $ — | $ — |
| Issuance of Class B common stock to Sponsor (1) | — | — | 7,187,500 | 719 | 24,281 | (25,000) | — | — |
| Collection of stock subscription receivable from stockholder | — | — | — | — | — | 25,000 | — | 25,000 |
| Net loss | — | — | — | — | — | — | (2,156) | (2,156) |
| **Balance – December 31, 2019** | — | — | 7,187,500 | 719 | 24,281 | — | (2,156) | 22,844 |
| Sale of 25,000,000 Units, net of underwriting discounts and public warrant liabilities | 25,000,000 | 2,500 | — | — | 231,881,777 | — | — | 231,884,277 |
| Sale of 741,250 Private Placement Units, net of private placement warrant liabilities | 741,250 | 74 | — | — | 7,293,826 | — | — | 7,293,900 |
| Forfeiture of Founder Shares | — | — | (937,500) | (94) | 94 | — | — | — |
| Class A common stock subject to possible redemption | (20,483,979) | (2,048) | — | — | (204,837,742) | — | — | (204,839,790) |
| Net loss | — | — | — | — | — | — | (29,361,225) | (29,361,225) |
| **Balance – December 31, 2020 (As Restated)** | 5,257,271 | $ 526 | 6,250,000 | $ 625 | 34,362,236 | $ — | $ (29,363,381) | $ 5,000,006 |

(1) Includes 937,500 shares of Class B common stock forfeited on October 5, 2020 as a result of the expiration of the underwriter's option to exercise their over-allotment (see Note 6).

CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year Ended December 31, 2020 | For the Period from June 25, 2019 (Inception) Through December 31, 2019 |
|---|---|---|
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (3,550,432) | $ (2,156) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Interest earned on marketable securities held in Trust Account | (66,590) | — |
| Changes in operating assets and liabilities: | | |
| Prepaid expenses | (157,486) | — |
| Accrued expenses | 3,327,963 | 1,966 |
| Net cash used in operating activities | (446,545) | (190) |
| **Cash Flows from Investing Activities:** | | |
| Investment of cash into Trust Account | (250,000,000) | — |
| Net cash used in investing activities | (250,000,000) | — |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from issuance of Class B common stock to Sponsor | — | 25,000 |
| Proceeds from sale of Units, net of underwriting discounts paid | 245,000,000 | — |
| Proceeds from sale of Private Placement Units | 7,412,500 | — |
| Proceeds from promissory note – related party | 40,000 | — |
| Repayment of promissory note – related party | (40,000) | — |
| Payment of offering costs | (430,268) | (5,000) |
| Net cash provided by financing activities | 251,982,232 | 20,000 |
| **Net Change in Cash** | 1,535,687 | 19,810 |
| Cash – Beginning of period | 19,810 | — |
| Cash – End of period | $ 1,555,497 | $ 19,810 |
| **Non-cash investing and financing activities:** | | |
| Offering costs included in accrued costs | $ — | $ 57,726 |
| Initial classification of Class A common stock subject to possible redemption | $ 238,249,360 | $ — |
| Change in value of Class A common stock subject to possible redemption | $ (3,549,720) | $ — |
| Deferred underwriting fee payable | $ 8,750,000 | |

73.     On May 7, 2021, the Company filed with the SEC a Form 10-K/A amending the 2020 10-K (the "2020 10-K/A"). The 2020 10-K/A was signed by Defendants Boris, Kiev, Berns, Goldberg, Katzman, and Nachbor. Defendants Boris and Kiev certified that the 2020 10-K/A fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 2020 10-K/A fairly presented, in all material respects, the financial condition and results of operations of the Company.

74.    The 2020 10-K/A contained the following, among other, information:

Item 1. Condensed Consolidated Financial Statements.

**FORUM MERGER III CORPORATION**
**CONDENSED CONSOLIDATED BALANCE SHEETS**

| | March 31, 2021 | December 31, 2020 |
|---|---|---|
| | (Unaudited) | |
| **ASSETS** | | |
| Current assets | | |
| Cash | $ 1,038,353 | $ 1,555,497 |
| Prepaid expenses | 174,124 | 157,486 |
| Total Current Assets | 1,212,477 | 1,712,983 |
| | | |
| Cash and marketable securities held in Trust Account | 250,004,042 | 250,066,590 |
| **Total Assets** | $ 251,216,519 | $ 251,779,573 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities - Accounts payable and accrued expenses | $ 3,815,030 | $ 3,329,929 |
| Deferred underwriting fee payable | 8,750,000 | 8,750,000 |
| Warrant liabilities | 16,325,028 | 29,859,848 |
| **Total Liabilities** | 28,890,058 | 41,939,777 |
| | | |
| **Commitments and Contingencies** | | |
| | | |
| Class A common stock subject to possible redemption, 21,732,646 and 20,483,979 shares at redemption value as of March 31, 2021 and December 31, 2020, respectively | 217,326,460 | 204,839,790 |
| | | |
| **Stockholders' Equity** | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized; none issued or outstanding | — | — |
| Class A common stock, $0.0001 par value; 100,000,000 shares authorized; 4,008,604 and 5,257,271 issued and outstanding (excluding 21,732,646 and 20,483,979, none shares subject to possible redemption) as of March 31, 2021 and December 31, 2020, respectively | 401 | 526 |
| Class B common stock, $0.0001 par value; 10,000,000 shares authorized; 6,250,000 shares issued and outstanding as of March 31, 2021 and December 31, 2020 | 625 | 625 |
| Additional paid-in capital | 21,875,691 | 34,362,236 |
| Accumulated deficit | (16,876,716) | (29,363,381) |
| **Total Stockholders' Equity** | 5,000,001 | 5,000,006 |
| **Total Liabilities and Stockholders' Equity** | $ 251,216,519 | $ 251,779,573 |

| | Class A Common Stock Shares | Class A Common Stock Amount | Class B Common Stock Shares | Class B Common Stock Amount | Additional Paid-in Capital | Stock Subscription Receivable from Stockholder | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| **Balance – June 25, 2019** | — | $ — | — | $ — | $ — | $ — | $ — | $ — |
| Issuance of Class B common stock to Sponsor (1) | — | — | 7,187,500 | 719 | 24,281 | (25,000) | — | — |
| Collection of stock subscription receivable from stockholder | — | — | — | — | — | 25,000 | — | 25,000 |
| Net loss | — | — | — | — | — | — | (2,156) | (2,156) |
| **Balance – December 31, 2019** | — | — | 7,187,500 | 719 | 24,281 | — | (2,156) | 22,844 |
| Sale of 25,000,000 Units, net of underwriting discounts | 25,000,000 | 2,500 | — | — | 235,812,232 | — | — | 235,814,732 |
| Sale of 741,250 Private Placement Units | 741,250 | 74 | — | — | 7,412,426 | — | — | 7,412,500 |
| Forfeiture of Founder Shares | — | — | (937,500) | (94) | 94 | — | — | — |
| Class A common stock subject to possible redemption | (23,469,964) | (2,347) | — | — | (234,697,293) | — | — | (234,699,640) |
| Net loss | — | — | — | — | — | — | (3,550,432) | (3,550,432) |
| **Balance – December 31, 2020** | 2,271,286 | $ 227 | 6,250,000 | $ 625 | $ 8,551,740 | $ — | $ (3,552,588) | $ 5,000,004 |

(1)  Includes 937,500 shares of Class B common stock forfeited on October 5, 2020 as a result of the expiration of the underwriter's option to exercise their over-allotment (see Note 5).

75.     On May 26, 2021, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 10-Q"). The 1Q21 10-Q was signed by Defendant Boris and Kiev, who certified that the 1Q21 10-Q fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 1Q21 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company.

76.     The 1Q21 10-Q contained the following, among other, information:

**FORUM MERGER III CORPORATION**
**CONDENSED CONSOLIDATED BALANCE SHEETS**

| | March 31, 2021 (Unaudited) | December 31, 2020 |
|---|---|---|
| **ASSETS** | | |
| Current assets | | |
| Cash | $        1,038,353 | $        1,555,497 |
| Prepaid expenses | 174,124 | 157,486 |
| Total Current Assets | 1,212,477 | 1,712,983 |
| Cash and marketable securities held in Trust Account | 250,004,042 | 250,066,590 |
| **Total Assets** | $      251,216,519 | $      251,779,573 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities - Accounts payable and accrued expenses | $        3,815,030 | $        3,329,929 |
| Deferred underwriting fee payable | 8,750,000 | 8,750,000 |
| Warrant liabilities | 16,325,028 | 29,859,848 |
| **Total Liabilities** | 28,890,058 | 41,939,777 |
| | | |
| **Commitments and Contingencies** | | |
| Class A common stock subject to possible redemption, 21,732,646 and 20,483,979 shares at redemption value as of March 31, 2021 and December 31, 2020, respectively | 217,326,460 | 204,839,790 |
| | | |
| **Stockholders' Equity** | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized; none issued or outstanding | — | — |
| Class A common stock, $0.0001 par value; 100,000,000 shares authorized; 4,008,604 and 5,257,271 issued and outstanding (excluding 21,732,646 and 20,483,979; none shares subject to possible redemption) as of March 31, 2021 and December 31, 2020, respectively | 401 | 526 |
| Class B common stock, $0.0001 par value; 10,000,000 shares authorized; 6,250,000 shares issued and outstanding as of March 31, 2021 and December 31, 2020 | 625 | 625 |
| Additional paid-in capital | 21,875,691 | 34,362,236 |
| Accumulated deficit | (16,876,716) | (29,363,381) |
| **Total Stockholders' Equity** | 5,000,001 | 5,000,006 |
| **Total Liabilities and Stockholders' Equity** | $      251,216,519 | $      251,779,573 |

77.    On June 9, 2021, the Company filed a Proxy Statement with the SEC (the "Proxy Statement"), shortly before the completion of the Merger. Defendants Boris, Kiev, Berns, Goldberg, Katzman, Nachbor, Taylor, and Luo[10] solicited stockholders to: (i) approve the Merger; (ii) approve the issuance of more than 20% of the Company's issued and outstanding common stock in connection with the Merger, including to ELMI securityholders and to SERES[11] ("Seres"); (iii) approve the Company's third amended and restated certificate of incorporation; (iv) approve on a non-binding advisory basis certain differences between the Company's second amended and restated certificate of incorporation and the proposed third amended and restated certificate of incorporation; (v) approve a new long term equity incentive plan (the "Incentive Plan"); (vi) and elect Defendants Taylor, Luo, Boris, Goldberg, Krzanich, McIntyre, and Peretz to serve as directors.

78.    The Proxy Statement contained the following statement regarding risk

---

[10]    According to the Current Report on Form 8-K filed by Forum with the SEC on December 11, 2020 (the "December 11, 2020 8-K"), "ELMI and its directors and executive officers may also be deemed to be participants in the solicitation of proxies from the stockholders of Forum in connection with the [Merger]." Thus, the Proxy Statement was also solicited by Defendants Taylor and Luo.

[11]    Prior to the Merger, ELMI made and sold the EC35 EV utility van in China by Chongqing Sokon Industry Group Co., Ltd ("Sokon"). SF Motors, Inc., now renamed Seres, Inc. ("Seres"), is a subsidiary of Sokon and was a major investor in ELMI's private investment in public equity fundraising round. Seres is also the original owner of the 675,000 square foot auto manufacturing facility in Mishawaka, Indiana, that produces ELMI vehicles.

oversight by the Board:

> Our Board's oversight of risk is administered directly through our Board, as a whole, or through its audit committee. Various reports and presentations regarding risk management are presented to our Board to identify and manage risk. The audit committee addresses risks that fall within the committee's area of responsibility. For example, the audit committee is responsible for overseeing the quality and objectivity of the Company's financial statements and the independent audit thereof. Management furnishes information regarding risk to our Board as requested.

79.     The Proxy Statement represented that the Audit Committee, which at the time consisted of Defendants Goldberg, Berns and Katzman, who subsequently left the Board after the Merger, would perform oversight over financial reporting. The Proxy Statement stated that "[e]ach member of the audit committee is financially literate," and details the oversight functions of the Audit Committee.

80.     The Proxy Statement stated the following regarding the administration of the Incentive Plan:

> A committee of at least two people appointed by the Board (or, if no such committee has been appointed, the Board) (the "Committee") will administer the Incentive Plan. The Committee will generally have the authority to designate participants, determine the type or types of awards to be granted to a participant, determine the terms and conditions of any agreements evidencing any awards granted under the Incentive Plan, accelerate the vesting or exercisability of, payment for or lapse of restrictions on, awards and to adopt, alter and repeal rules, guidelines and practices relating to the Incentive Plan. The Committee will have full discretion to administer and interpret the Incentive Plan and to make any other determinations and/or take any other action that it deems necessary or desirable for the administration of the Incentive Plan, and any such determinations or actions taken by the Committee

shall be final, conclusive and binding upon all persons and entities. The Committee may delegate to one or more officers of the Company or any affiliate the authority to act on behalf of the Committee with respect to any matter, right, obligation or election that is the responsibility of or that is allocated to the Committee in the Incentive Plan and that may be so delegated as a matter of law, except for grants of awards to persons subject to Section 16 of the Exchange Act.

81.     The Proxy Statement also stated that "[t]he Compensation Committee will administer the post-combination company's policies consistent with the Sarbanes-Oxley Act, which would recover CEO and CFO bonuses or equity awards in the event of a financial restatement under the Sarbanes-Oxley Act."

82.     The Proxy Statement contained the following, among other, information:

## FORUM MERGER III CORPORATION
## CONSOLIDATED BALANCE SHEETS

| | December 31 | |
| --- | --- | --- |
| | 2020 | 2019 |
| | (As Restated) | |
| **ASSETS** | | |
| Current assets | | |
| Cash | $   1,555,497 | $   19,810 |
| Prepaid expenses | 157,486 | — |
| Total Current Assets | 1,712,983 | 19,810 |
| Deferred offering costs | — | 62,726 |
| Cash and marketable securities held in Trust Account | 250,066,590 | — |
| **TOTAL ASSETS** | **$ 251,779,573** | **$   82,536** |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities | | |
| Accrued expenses | $   3,329,929 | $     1,966 |
| Accrued offering costs | — | 57,726 |
| Total Current Liabilities | 3,329,929 | 59,692 |
| Deferred underwriting fee payable | 8,750,000 | — |
| Warrant liabilities | 29,859,848 | — |
| **TOTAL LIABILITIES** | **41,939,777** | **59,692** |
| | | |
| Commitments and Contingencies | | |
| Class A common stock subject to possible redemption, 20,483,979 and none shares at redemption value as of December 31, 2020 | 204,839,790 | — |
| | | |
| **Stockholders' Equity** | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized, none issued and outstanding | — | — |
| Class A common stock, $0.0001 par value; 100,000,000 shares authorized; 5,257,271 and none issued and outstanding (excluding 20,483,979 and none shares subject to possible redemption) as of December 31, 2020 and 2019, respectively | 526 | — |
| Class B common stock, $0.0001 par value; 10,000,000 shares authorized; 6,250,000 and 7,187,500 shares issued and outstanding as of December 31, 2020 and 2019, respectively[1] | 625 | 719 |
| Additional paid-in capital | 34,362,236 | 24,281 |
| Accumulated deficit | (29,363,381) | (2,156) |
| **Total Stockholders' Equity** | **5,000,006** | **22,844** |
| **Total Liabilities and Stockholders' Equity** | **$ 251,779,573** | **$   82,536** |

(1) At December 31, 2019, the shares issued and outstanding includes 937,500 shares of Class B common stock forfeited on October 5, 2020 as a result of the expiration of the underwriter's option to exercise their over-allotment (see Note 6).

## FORUM MERGER III CORPORATION
## CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Stock Subscription Receivable from Stockholder | Accumulated Deficit | Total Stockholders' Equity |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | Shares | Amount | | | | |
| **Balance – June 25, 2019** | — | $   — | — | $   — | $   — | $   — | $   — | $   — |
| Issuance of Class B common stock to Sponsor[1] | — | — | 7,187,500 | 719 | 24,281 | (25,000) | — | — |
| Collection of stock subscription receivable from stockholder | — | — | — | — | — | 25,000 | — | 25,000 |
| Net loss | — | — | — | — | — | — | (2,156) | (2,156) |
| **Balance – December 31, 2019** | — | — | 7,187,500 | 719 | 24,281 | — | (2,156) | 22,844 |
| Sale of 25,000,000 Units, net of underwriting discounts and public warrant liabilities | 25,000,000 | 2,500 | — | — | 231,881,777 | — | — | 231,884,277 |
| Sale of 741,250 Private Placement Units, net of private placement warrant liabilities | 741,250 | 74 | — | — | 7,293,826 | — | — | 7,293,900 |
| Forfeiture of Founder Shares | — | — | (937,500) | (94) | 94 | — | — | — |
| Class A common stock subject to possible redemption | (20,483,979) | (2,048) | — | — | (204,837,742) | — | — | (204,839,790) |
| Net loss | — | — | — | — | — | — | (29,361,225) | (29,361,225) |
| **Balance – December 31, 2020 (As Restated)** | 5,257,271 | $   526 | 6,250,000 | $   625 | $ 34,362,236 | $   — | $ (29,363,381) | $ 5,000,006 |

(1) Includes 937,500 shares of Class B common stock forfeited on October 5, 2020 as a result of the expiration of the underwriter's option to exercise their over-allotment (see Note 6).

83.    The foregoing statements in the Proxy Statement were false and misleading and omitted material information. In fact, the Board failed to implement and maintain an effective system of internal controls over financial reporting and director compensation and the Company has been substantially damaged thereby.

84.    As a result of the material misstatements and omissions contained in the Proxy Statement, Company shareholders voted to, inter alia: (i) approve the Merger; (ii) approve the issuance of more than 20% of the Company's issued and outstanding common stock in connection with the Merger, including to ELMI security holders and to Seres; (iii) approve the Company's third amended and restated certificate of incorporation; (iv) approve on a non-binding advisory basis certain differences between the Company's second amended and restated certificate of incorporation and the proposed third amended and restated certificate of incorporation; (v) approve a new long term equity incentive plan (the "Incentive Plan"); (vi) and elect Defendants Taylor, Luo, Boris, Goldberg, Krzanich, McIntyre, and Peretz to serve as directors.

85.    On August 13, 2021, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 10-Q"), which was the Company's first quarterly report following the completion of the Merger on June 25, 2021. The 2Q21 10-Q was signed by Defendants Taylor and Li, who

certified that the 2Q21 10-Q fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 2Q21 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company.

86.    The 2Q21 10-Q contained the following, among other, information:

**ELECTRIC LAST MILE SOLUTIONS, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS (in thousands, except par value and share data)**

| | Successor | | Predecessor |
| | June 30, 2021 (Unaudited) | December 31, 2020 | December 31, 2020 |
|---|---|---|---|
| **ASSETS** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 171,529 | $ 25,205 | $ — |
| Restricted cash | 45,902 | — | — |
| Prepaid expenses and other current assets | 3,809 | — | 42 |
| Inventories | 824 | — | — |
| Total current assets | 222,064 | 25,205 | 42 |
| Property, plant and equipment, net | 191,966 | — | 131,908 |
| Intangibles and other assets, net | 6,802 | 38 | — |
| TOTAL ASSETS | $ 420,832 | $ 25,243 | $ 131,950 |
| | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 7,076 | $ 1,345 | $ 178 |
| Accrued expenses | 2,741 | 5,532 | 1,233 |
| Current portion of land contract and promissory note | 66,658 | — | — |
| Total current liabilities | 76,475 | 6,877 | 1,411 |
| Convertible promissory notes | — | 25,094 | — |
| Land contract and promissory note obligations, net of current portion | 42,716 | — | — |
| Warrant liabilities | 19,447 | — | — |
| Pension benefit obligation | 114 | — | 109 |
| Other long-term liabilities | 443 | — | — |
| Total liabilities | 139,195 | 31,971 | 1,520 |
| COMMITMENTS AND CONTINGENCIES | | | |
| Predecessor parent's net investment | — | — | 130,430 |
| Preferred stock, $0.0001 par value; 100 million shares authorized; none issued or outstanding. | — | — | — |
| Common stock, $0.0001 par value; 1 billion shares authorized; 124,027,012 issued and 118,777,012 outstanding at June 30, 2021 and 82,117,288 issued and outstanding at December 31, 2020. | 13 | 8 | — |
| Additional paid-in capital | 301,467 | 992 | — |
| Accumulated deficit | (19,842) | (7,728) | — |
| Total shareholders' equity (deficit) | 281,637 | (6,728) | 130,430 |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY | $ 420,832 | $ 25,243 | $ 131,950 |

87.     The 2Q21 10-Q also detailed Defendant Luo's stock transactions shortly before the completion of the Merger:

> On June 23, 2021, an entity controlled by Jason Luo sold 6,097 common shares of ELM back to ELM for the original purchase price of $10.00 per share or a total of $61 thousand, prior to and in connection with the issuance of 5,000,000 shares of the Company's common stock to SERES upon the closing of the Business Combination pursuant to the SERES Asset Purchase Agreement. This transaction was presented in the condensed consolidated statement of changes in shareholders' equity (deficit) retroactively applying the exchange ratio from the Business Combination.

88.     On November 12, 2021, the Company filed with the SEC its Quarterly Report on Form 10-Q SEC for the period ended September 30, 2021 (the "3Q21 10-Q"). The 3Q21 10-Q was signed by Defendants Taylor and Song, who certified that the 3Q21 10-Q fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 3Q21 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company.

89.     The 3Q21 10-Q contained the following, among other, information:

ELECTRIC LAST MILE SOLUTIONS, INC.
CONDENSED CONSOLIDATED BALANCE SHEETS (in thousands, except par value and share data)

| | Successor | | Predecessor |
|---|---|---|---|
| | September 30, 2021 (Unaudited) | December 31, 2020 | December 31, 2020 |
| **ASSETS** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 143,154 | $ 25,205 | $ — |
| Restricted cash | 27,750 | — | — |
| Accounts receivable | 136 | — | — |
| Prepaid expenses and other current assets | 8,503 | — | 42 |
| Inventories | 7,579 | — | — |
| Total current assets | 187,122 | 25,205 | 42 |
| Property, plant and equipment, net | 192,736 | — | 131,908 |
| Intangibles and other assets, net | 6,124 | 38 | — |
| TOTAL ASSETS | $ 385,982 | $ 25,243 | $ 131,950 |
| | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 7,757 | $ 1,345 | $ 178 |
| Accrued expenses | 10,386 | 5,532 | 1,233 |
| Current portion of land contract and promissory note | 54,286 | — | — |
| Total current liabilities | 72,429 | 6,877 | 1,411 |
| Convertible promissory notes | — | 25,094 | — |
| Land contract and promissory note obligations, net of current portion | 29,800 | — | — |
| Warrant liabilities | 14,243 | — | — |
| Pension benefit obligation | 90 | — | 109 |
| Other long-term liabilities | 451 | — | — |
| Total liabilities | 117,013 | 31,971 | 1,520 |
| COMMITMENTS AND CONTINGENCIES | | | |
| Predecessor parent's net investment | — | — | 130,430 |
| Preferred stock, $0.0001 par value; 100 million shares authorized; none issued or outstanding | — | — | — |
| Common stock, $0.0001 par value; 1 billion shares authorized; 124,027,012 issued and 118,777,012 outstanding at September 30, 2021 and 82,117,288 issued and outstanding at December 31, 2020. | 12 | 8 | — |
| Additional paid-in capital | 306,578 | 992 | — |
| Accumulated deficit | (37,621) | (7,728) | — |
| Total shareholders' equity (deficit) | 268,969 | (6,728) | 130,430 |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY | $ 385,982 | $ 25,243 | $ 131,950 |

## C.    ELMS Discloses Improper Equity Transactions Forcing A Restatement Of The Company's Financial Statements

90.    On February 1, 2022, ELMS filed with the SEC a Current Report on

Form 8-K ("February 1, 2022 8-K"), which attached a press release announcing the

resignations of Defendants Taylor and Luo from their director and officer positions

based on their, and other ELMI executives', involvement in the Improper Equity Transactions, *i.e.*, unreported purchasing of ELMI equity at substantial discounts to market value without obtaining an independent valuation:

> Shauna McIntyre, a member of the Company's Board of Directors, has been appointed as Interim Chief Executive Officer and President, succeeding James Taylor, who has resigned from his role as Chief Executive Officer and a member of the Board. In addition, Brian Krzanich has been appointed Non-Executive Chairman of the Board, replacing Jason Luo, who has also resigned from his position as Executive Chairman of the Board. The departures follow an investigation conducted by a Special Committee of the Board of Directors (the "Special Committee").

***

> On November 25, 2021, the Company's Board formed an independent Special Committee to conduct an inquiry into certain sales of equity securities made by and to individuals associated with the Company, the legal, disclosure and tax consequences of those transactions, and other issues that arose in connection those sales. Based on the Special Committee's investigation, the Company has concluded that in November and December 2020, shortly before the Company's December 10, 2020 announcement of a definitive agreement for a business combination with Forum Merger III Corporation, certain Electric Last Mile Inc. executives purchased equity in the Company at substantial discounts to market value without obtaining an independent valuation. ***Mr. Taylor purchased equity in these transactions. Mr. Luo participated in these and other transactions and directly or indirectly purchased and sold equity in such transactions***.

91.   The Company also disclosed that it would restate[12] its previously reported financial statements, that those financial statements should not be relied upon, and there were material weaknesses in its internal controls over financial reporting:

> On January 26, 2022, on the basis of the Special Committee investigation discussed in Item 8.01 below which is incorporated by reference into this Item 4.02, the Board concluded that the previously issued consolidated financial statements of Electric Last Mile, Inc. as of December 31, 2020 and the period from August 20, 2020 (inception) through December 31, 2020 included in the Company's Registration Statement on Form S-1 (File No. 333-258146) (the "Audited Financial Statements") should be restated and, therefore, should no longer be relied upon. In addition, the Board concluded that the Company's financial statements as of and for the six months ended June 30, 2021 included in its Quarterly Report on Form 10-Q (File No. 001-39357) filed on August 13, 2021 and the Company's financial results as of and for the nine months ended September 30, 2021 included in its Quarterly Report on Form 10-Q (File No. 001-39357) filed on November 12, 2021 should no longer be relied upon (together with the Audited Financial Statements, the "Non-Reliance Periods").
>
> ***In connection with this conclusion, the Company, together with its advisors, is evaluating the accounting and treatment of certain equity issuances to executive officers discussed in Item 8.01 of this Current Report on Form 8-K.*** The Company has engaged legal counsel and an accounting adviser with respect to this matter. Although the Company

---

[12]   Restatements are necessary, and are required, when it is determined that a previous financial statement contained a material inaccuracy at the time the statement was reported. *See* Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 250-10-45-24; FASB ASC 250-10-50-4; and FASB ASC 250-10-20. Further, SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure.

cannot, at this time, estimate when it will file its restated financial statements for the Non-Reliance Periods, it is diligently pursuing completion of the restatement, including with respect to an evaluation of the Company's financial statement reserves for tax payments and contingencies.

The Company has undertaken an assessment of the accuracy of the Company's historical financial statements and related disclosures that were contained in the aforementioned Registration Statement on Form S-1 and Quarterly Reports on Form 10-Q. ***In light of the foregoing, the Company also expects to determine that material weaknesses exist in the Company's internal control over financial reporting and that disclosure controls and procedures were ineffective during the Non-Reliance Period.*** The Company will amend any disclosures pertaining to its evaluation of such controls and procedures as appropriate in connection with our anticipated restated filings.

92. The February 1, 2022 8-K gave further details about the Improper Equity Transactions, revealing that other senior members of management were involved and that Defendants Taylor and Luo had lied to the Special Committee:

The Company is basing its evaluation on the basis of the following background: In August and September 2020, Mr. Luo founded and funded ELMI by causing ELMI to issue 1,000 shares of common stock to Mr. Luo's entity, AJ Capital, Inc., at $10 per share. Subsequently, on September 18, 2020, Forum, on the one hand, and ELMI and Messrs. Luo and Taylor, on the other hand, executed a letter of intent for a proposed business combination transaction between Forum and ELMI, estimating the total enterprise value ascribed to the combined company at $1.3 billion. At that time, Mr. Luo owned, through AJ Capital, Inc., 100% of the issued shares of ELMI. Thereafter, on November 19, 2020, ELMI issued and sold 99,000 shares of common stock for $990,000 to seven investors (the "November 2020 Equity Transaction"). As described in the Company's S-1 and Proxy Statement, those seven investors included an entity affiliated with Mr. Taylor, called The JET Group, LLC, which purchased 6,461 shares of ELMI common stock at $10 per share, for a total of $64,610 and two entities affiliated with Mr.

Luo, which purchased 78,016 shares of ELMI common stock at $10 per share, for a total of $780,160. Specifically, Luo Pan Investment II, LLC purchased 20,000 shares of ELMI common stock for $200,000, and AJ Capital Investment, LLC purchased 58,016 shares of ELMI common stock for $580,160. In addition, on December 8, 2020, Mr. Luo through AJ Capital, Inc. sold 1,000 shares of ELMI common stock for $10 per share for a total of $10,000 directly or indirectly to other members of senior management (the "December 2020 Equity Transaction").

Prior to the November 2020 Equity Transaction and the December 2020 Equity Transaction, ELMI does not appear to have obtained an independent valuation to determine the fair market value per share of its common stock as of or contemporaneous with the date of those transactions. Because Mr. Taylor may have been seen as providing services to ELMI at the time he participated in the November 2020 Equity Transaction, the Company is evaluating whether ELMI should have treated as compensation to Mr. Taylor any difference between (a) the fair market value of the shares sold by ELMI to The JET Group, LLC and (b) the $10 per share Mr. Taylor paid or caused to be paid. The Company is further evaluating whether a compensation expense should have been recorded and taxes paid in connection with the December 2020 Equity Transaction.

In announcing the Business Combination on December 11, 2020, the Company disclosed an implied equity value for the combined company of approximately $1.4 billion. When the business combination was consummated on June 25, 2021, each ELMI share, for which such executives had paid $10 per share, was exchanged for approximately 800 shares of Electric Last Mile Solutions, Inc.

The Company did not, however, recognize any compensation associated with Mr. Taylor's participation in the November 2020 Equity Transaction, or in connection with the December 2020 Equity Transaction; disclose any compensation associated with those transactions; or withhold or pay taxes in connection with that compensation. ***Other senior members of management also participated in such transactions in November and December 2020. Furthermore, in connection with the Special Committee investigation, Messrs. Luo and Taylor provided responses to the Special Committee***

46

*that are believed to be inconsistent with documents reviewed by the Special Committee and its counsel*.

93.    The February 1, 2022 8-K discussed the details of compensation arrangements between the Company and Defendants Taylor and Luo, disclosing that the Company would continue paying Taylor and Luo as consultants despite their misconduct:

> In connection with Mr. Taylor's resignation, he and the Company agreed to settlement terms, pursuant to which the Company and Mr. Taylor agreed to a mutual release of claims (including payment by the Company of certain specified taxes that may result from Mr. Taylor's equity purchase referred to above), as well as non-competition and non-solicitation covenants for up to 18 months. As part of this arrangement, Mr. Taylor will serve as a consultant to the Company for a period of two years, on terms to be commercially agreed upon, for an annual wage of $300,000. Mr. Taylor will retain his 2021 cash bonus, 2021 performance RSUs and health benefits. The consulting agreement will be terminable at the option of either the Company or Mr. Taylor with 60 days' notice. ***Pursuant to the settlement, Mr. Taylor will surrender 1.8 million shares of the Company's common stock to the Company and, no later than April 11, an additional number of shares of Company common stock with a value of approximately $3.3 million based on a VWAP calculation. Mr. Taylor will be subject to a standstill for 18 months, during which he is precluded from taking any action in connection with Company's board or shareholders.*** Mr. Taylor will retain his existing indemnification and advancement rights. Mr. Taylor has agreed to a six month lockup from the date hereof and has surrendered his existing registration rights.
>
> In connection with Mr. Luo's resignation, he and the Company agreed to settlement terms, pursuant to which the Company and Mr. Luo agreed to a mutual release of claims, as well as non-competition and non-solicitation covenants for at least 18 months. As part of this arrangement, Mr. Luo will serve as a consultant to the Company for a period of two years for which he will receive no additional

compensation. The consulting agreement will be terminable at the option of either the Company or Mr. Luo with 60 days' notice. Mr. Luo will also become a limited observer to the Company's Board of Directors for a period of two years. ***Pursuant to the settlement, Mr. Luo will promptly surrender 6.0 million shares of the Company's common stock to the Company. In addition, no later than 120 days after the date hereof, Mr. Luo will pay an additional amount of cash and stock, at his option, totaling $10 million in value, with any stock value based on a VWAP calculation***. Mr. Luo will retain his health benefits. Mr. Luo will be subject to a standstill for eighteen months, during which he is precluded from taking any action in connection with Company's board or shareholders. Mr. Luo will retain his existing indemnification and advancement rights. Mr. Luo has agreed to a six month lockup (with limited carveouts) from the date hereof and has surrendered his existing registration rights.

94.    Based on these disclosures, the price per share of the Company's common stock fell $2.88 per share from its close price of $5.59 per share on February 1, 2022 to close at $2.71 per share on February 2, 2022, a decline of approximately 51%.

**D.    The Company Discloses Disagreements With Its External Auditor**

95.    On February 24, 2022, the Company filed with the SEC a Current Report on Form 8-K (the "February 24, 2022 8-K"). In the February 24, 2022 8-K, the Company disclosed that its independent registered public accounting firm, BDO LLP, had resigned on February 8, 2022 because of disagreements with the Company.

96.    The Company disclosed two central disagreements with BDO, relating to the Improper Equity Transactions, which led to the firm's resignation. The first disagreement involved whether BDO satisfied the SEC's independence

requirements because an affiliate of BDO advised Defendants Luo and Taylor in connection with the Improper Equity Transactions :

> The Company is hereby reporting two disagreements with BDO: (i) prior to BDO's resignation, a disagreement as to whether BDO met the relevant requirements for auditor independence of the SEC and the PCAOB; and (ii) on the date of BDO's resignation, a disagreement as to whether the Company has taken timely and appropriate remedial action within the meaning of Section 10A of the Exchange Act.

> As an independent registered public accounting firm, BDO and its associated persons were required by the SEC's and PCAOB's rules to be independent of the Company throughout the audit and professional engagement period. Furthermore, under PCAOB Rule 3526(b), BDO was required to: (i) describe in writing to the Audit Committee all relationships between BDO, BDO's affiliates and the Company that may reasonably be thought to bear on BDO's independence; (ii) discuss with the Audit Committee the potential effects of any such relationships on BDO's independence; (iii) affirm in writing to the Audit Committee that BDO is independent under SEC and PCAOB rules; and (iv) document the substance of its discussion with the Audit Committee.

> ***During the course of its investigation, the Special Committee identified potential concerns regarding BDO's independence. In particular, the Special Committee identified that BDO's Tax Advisory Group ("BDO Tax") had helped to create and structure the Transactions that ultimately resulted in the resignations of ELMI's co-founder, Jason Luo, who served as Executive Chairman of ELMI and subsequently served as Executive Chairman of the Company until his resignation on February 1, 2022, and of Jim Taylor, our former Chief Executive Officer.***

> ***BDO Tax provided advice to Mr. Luo and his affiliates.*** PCAOB Rule 3522 restricts the ability of an auditor to provide non-audit services to an audit client related to the tax treatment of a "confidential transaction" or a transaction "a significant purpose of which is tax avoidance." Similarly, PCAOB Rule 3523 limits an auditor's provision of tax

services to a "person in a financial reporting oversight role at the issuer audit client."

*The Special Committee also identified BDO's failure to disclose the BDO Tax engagement in BDO's letter to the Audit Committee dated July 15, 2021, in which BDO purported to list relationships between the Company and BDO and its affiliates that may reasonably be thought to bear on its independence.* PCAOB Rule 3526(b) provides that a registered public accounting firm must, at least annually, describe, in writing, to the audit committee of an audit client, all relationships between the firm or any affiliates of the firm and the audit client or persons in financial reporting oversight roles at the audit client, that, as of the date of the communication, may reasonably be thought to bear on independence.

The Company, the Audit Committee and their representatives repeatedly requested that BDO provide its independence analysis with respect to the services provided by BDO Tax. As of the date of this report, BDO has failed to provide the requested information.

97.   The second disagreement with BDO disclosed in the February 24, 2022 8-K concerned whether ELMS had taken appropriate remedial action following the disclosure of the Improper Equity Transactions:

The Company also believes that BDO wrongly claimed that the Company did not take timely and appropriate remedial action with respect to the matters reported in its February 1 Form 8-K.

Exchange Act Section 10A requires an auditor that has detected the possible occurrence of certain "illegal acts" to, among other things, inform management and the audit committee of such acts. In addition, under Section 10A the auditor must notify the board if the company's management and board have not taken "timely and appropriate remedial actions with respect to the illegal act."

*On February 8 – the date of its resignation – BDO sent a separate letter addressed to the Board invoking Section 10A and claiming that*

*the Company had not taken such timely and appropriate remedial action.* The next day, on February 9, 2022, the Audit Committee sent a letter to BDO responding in detail to BDO's claims. As noted below, this correspondence is attached as exhibits to this filing.

Contrary to BDO's claim that the Company failed to respond adequately to the discovery of the Transactions, it was the Company itself that uncovered the Transactions and brought them to the attention of BDO. The Board formed the Special Committee and caused it to investigate the issues discussed in the February 1 Form 8-K. The Special Committee provided BDO regular updates throughout the investigation process.

BDO's purported claim under Section 10A rings particularly hollow given BDO Tax's role in helping to structure the Transactions – matters which ultimately resulted in the resignation of the Company's former Chief Executive Officer and former Executive Chairman. Indeed, BDO itself had an obligation under Section 10A(a)(2) to include in its audit "procedures designed to identify related party transactions that are material to the financial statements or otherwise require disclosure therein." Given that the Special Committee brought the Transactions to the attention of BDO, and not the other way around, it is not clear how BDO met this requirement.

In sum, the Company believes BDO's claims are directly at odds with the facts of its engagement, BDO's involvement in and contemporary awareness of the underlying transactions, and the regular updates that the Special Committee provided to BDO throughout the investigation process.

98.   In the February 24, 2022 8-K, the Company disclosed that its new leadership was "conducting a comprehensive review of the status of the Company's products and commercial plans, the results of which will be reported publicly as soon as they are available."

99.   On March 4, 2022, the Company filed with the SEC a Form 8-K/A attaching as an exhibit a letter of BDO dated March 1, 2022, in which BDO disagreed with statements made in the February 24, 2022 8-K.

**E.    ELMS Discloses That It Is Under Investigation by the SEC**

100.  On March 11, 2022, ELMS filed a Current Report on Form 8-K (the "March 11, 2022 8-K") disclosing that the Company had terminated Defendant Taylor's consulting agreement effective as of May 10, 2022.

101.  The March 11, 2022 8-K disclosed further details of the comprehensive review of the Company's products and commercial plans:

Vehicle Status

On February 14, 2022, Electric Last Mile Solutions, Inc. (the "Company") announced in a Current Report on Form 8-K that it was conducting a comprehensive review of the status of its products and commercialization plan under the guidance of the Company's new leadership. With the assistance of outside consultants, management is continuing to assess the Company's planned product offerings, production plans, and certification processes, including the feasibility of meeting previously announced targets.

The Company currently expects to commence production of certified Urban Delivery vehicles no earlier than the end of 2022 and into first quarter of 2023, followed by the Urban Utility vehicle no earlier than the first half of 2023. The Company had previously disclosed in September 2021 that it had successfully launched the ELMS Urban Delivery vehicle, and in November 2021, the Company announced that it expected to have certified Urban Delivery vehicles available for sale by year-end and that production of its Urban Utility vehicle was expected to commence in the second half of 2022. The operational processes planned by the Company's new leadership around

certification and safety testing, vehicle durability testing and other pre-preproduction steps are causing delays in the commercialization timeframe for Urban Delivery, Urban Utility and other vehicles. Management is committed to working closely with its commercial partners to produce quality vehicles that meet appropriate safety standards and will only sell vehicles if and when such standards are met.

102. In the March 11, 2022 8-K, the Company withdrew all previous

guidance and estimates due to the lack of internal controls over financial reporting:

In connection with management's review, and in light of the disclosures in this Item 7.01, the Company has decided to ***withdraw all previously issued business outlook and related forward-looking statements, as well as other commercialization targets issued by the Company, until such time as it has improved forecasting confidence.*** The statements in this Current Report on Form 8-K hereby supersede any previously issued disclosure and guidance from the Company with respect to such matters. The Company intends to keep the public informed of its progress.

These statements and estimates with respect to our product launch and otherwise in this Item 7.01 are unaudited and preliminary and do not present all information necessary for an understanding of the Company's financial condition and results of operations. The completion of the Company's year-end accounting procedures, including execution of the Company's internal control over financial reporting, and audit of the Company's financial statements for the year ended December 31, 2021 is ongoing and could result in changes to the information set forth above.

The information in Item 7.01 of this Current Report on Form 8-K is being furnished and shall not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that Section and shall not be deemed incorporated by reference into any registration statement or other document filed pursuant to the Securities Act of 1933, as

53

amended, except as shall be expressly set forth by specific reference in such filing.

103.  Further, in the March 11, 2022 8-K, the Company disclosed that it had learned, on March 7, 2022, of an investigation by the SEC's Division of Enforcement into "matters discussed in Current Reports on Form 8-K filed by the Company on September 27, 2021, February 1, 2022 and February 14, 2022 and Exhibits 99.1 and 99.2[13] to Forum Merger III Corporation's Current Report on Form 8-K filed on March 16, 2021." The Company stated that it could not "predict the eventual scope, duration or outcome of this matter."

104.  The March 11, 2022 8-K also disclosed a serious cash flow issue with the Company, reporting that it only had sufficient cash on hand to continue operations through sometime between July and September 2022:

> The Company continues to work with outside advisors to determine its current liquidity position and ongoing funding needs. The Company previously announced on February 1, 2022 that it expected to report that it had $132.0 to $142.0 million in cash and cash equivalents, which includes $25.0 to $30.0 million of restricted cash, as of December 31, 2021. The Company has since confirmed that it had approximately $137 million in cash and cash equivalents, which included approximately $27 million of restricted cash, as of December 31, 2021. As of March 10, 2022, the Company currently estimates it has approximately $95 million in cash and cash equivalents, including approximately $24 million in restricted cash. ***The Company currently believes it has sufficient cash to continue operations through***

---

[13]    Exhibit 99.1 is a Forum press release discussing a large increase in Urban Utility pre-orders and announcing the start date of Urban Utility production. Exhibit 99.2 is a March 2021 investor presentation.

***sometime between July and September 2022.*** We are continuing to evaluate our rate of cash expenditures, which will be affected by expenses related to professional fees associated with ongoing compliance, regulatory and litigation matters; financial statement preparation and audit costs; and the pace and cost of our ongoing vehicle development work. Additionally, as disclosed in Item 5.02 of this Current Report on Form 8-K, the Company has provided notice to Mr. Taylor of the termination of the Consulting Agreement and his services thereunder. The Company is actively pursuing potential sources of liquidity and is working to extend its cash runway during this process to the extent possible, if at all. The Company will not be able to launch the Urban Delivery, Urban Utility or any other vehicle without obtaining such additional liquidity.

105. On March 15, 2022, the Company filed with the SEC an amended Current Report on Form 8-K/A regarding its March 4, 2022 Form 8-K. The March 15, 2022 8-K/A disclosed that the Board, on February 21, 2022, approved a "planned reduction in force of 50 employees, constituting approximately 24% of the Company's headcount, as part of an overall plan to focus the Company on its core business and streamline its cost structure." In connection with the reduction, the Company reported an expected "net pre-tax charges of approximately $0.3 million in severance and related costs."

106. On April 1, 2022, the Company filed with the SEC a Form NT 10-K providing notification of its inability to timely file an annual report for the period ended December 31, 2021. The Form NT 10-K disclosed that the Company's inability to timely file the Form 10-K, resulted from, in large part, the Improper Equity Transactions, the resulting investigation by the Special Committee, the

resignation of BDO, and related events. The Form NT 10-K also stated that the Company is "further evaluating whether it properly disclosed the equity purchases entered into by certain ELMI executives, whether it properly assessed the accounting treatment and compensation expense associated with such purchases, and whether it properly paid and withheld the taxes associated with such purchases." The Form NT 10-K noted the previously disclosed ongoing material weaknesses in financial reporting:

> The Company has undertaken an assessment of the accuracy of the Company's historical financial statements and related disclosures that were contained in the aforementioned Registration Statement on Form S-1 and Quarterly Reports on Form 10-Q. In light of the foregoing, the Company also expects to determine that material weaknesses exist in the Company's internal control over financial reporting and that disclosure controls and procedures were ineffective during the Non-Reliance Period.

107.  On April 11, 2022, the Company announced that it received a notice from Nasdaq stating that because the Company has not yet filed its Annual Report on Form 10-K for the fiscal year 2021, the Company was no longer in compliance with Nasdaq Listing Rule 5250(c)(1), which requires listed companies to timely file all required periodic reports with the SEC. The notice indicated that the Company must submit a plan within 60 calendar days from April 1, 2022, or no later than May 31, 2022, addressing how it intends to regain compliance with Nasdaq's listing rules.

108.  On May 18, 2022, the Company filed with the SEC a Form 12b-25 providing notification of its inability to timely file a quarterly report for the period ended March 31, 2022. The Form 12b-25 disclosed that the Company's inability to timely file the Form 10-Q resulted from, in large part, the Improper Equity Transactions, the resulting investigation by the Special Committee, the resignation of BDO, and related events. The Form 12b-25 also reported that the Company's Audit Committee was searching for a "replacement independent registered public accounting firm." Consequently, the new accounting firm "will require time in which to conduct and complete its review of the Company's current financial statements and the Non-Reliance Periods, as well as its assessment of the Company's internal control over financial reporting."

109.  On May 24, 2022, ELMS filed with the SEC a Current Report on Form 8-K, which attached a press release announcing that the Company had received a notice from Nasdaq stating that because the Company has not yet filed its Quarterly Report on Form 10-Q for the first quarter of 2022 and the Company's continued delay in filing its Annual Report on Form 10-K for the fiscal year 2021, the Company was not in compliance with Nasdaq Listing Rule 5250(c)(1), which requires listed companies to timely file all required periodic reports with the SEC. The notice indicated that the Company must submit a plan no later than May 31, 2022, addressing how it intends to regain compliance with Nasdaq's listing rules.

**F.     ELMS Is Sued in Securities Class Action Lawsuits**

110.  Following the above disclosures regarding the Improper Equity
Transactions, the restatement of the Company's financial statements, and the SEC
investigation, securities class action lawsuits were filed against ELMS and the
Individual Defendants. On February 3, 2022, *Hacker v. Electric Miles Solutions,
Inc., et al.*, No. 2:22-cv-00545-CCC-LDW (D.N.J.), was filed seeking damages on
behalf of persons or entities who purchased or otherwise acquired publicly traded
ELMS securities between March 31, 2021 and February 1, 2022, inclusive. Hacker
charged the Company, Defendants Taylor, Luo, Boris, Kiev, Li, and Song with
violations of Sections 10(b) and 20(a) of the Exchange Act of 1934 ("Exchange
Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.
Hacker alleges that the named defendants made false and/or misleading statements
and/or failed to disclose that: (1) ELMS's previously issued financial statements
were false and unreliable; (2) ELMS's earlier reported financial statements would
need restatement; (3) certain EMLS executives and/or directors purchased equity in
the Company at substantial discounts to market value without obtaining an
independent valuation; (4) on November 25, 2021, the Company's Board formed an
independent Special Committee to conduct an inquiry into certain sales of equity
securities made by and to individuals associated with the Company; and (5) as a

result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

111.   On April 4, 2022, *Fontaine v. Electric Miles Solutions, Inc., et al.*, No. 2:22-cv-01902-CCC-LDW (D.N.J.), was filed seeking damages on behalf of persons or entities who purchased or otherwise acquired publicly traded ELMS securities or Forum Merger III Corporation securities between November 12, 2020 and February 1, 2022, inclusive. Fontaine charged the Company, Defendants Taylor, Luo, Boris, Kiev, Li, and Song with violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC. Fontaine alleges that the named defendants made false and/or misleading statements and/or failed to disclose that: (1) ELMS's previously issued financial statements were false and unreliable; (2) ELMS's earlier reported financial statements would need restatement; (3) certain EMLS executives and/or directors purchased equity in the Company at substantial discounts to market value without obtaining an independent valuation; (4) on November 25, 2021, the Company's Board formed an independent Special Committee to conduct an inquiry into certain sales of equity securities made by and to individuals associated with the Company; and (5) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

112.   On April 22, 2022, the securities class actions were consolidated under the caption *In Re Electric Last Mile Solutions, Inc. Securities Litigation*, No. 22-cv-545 (D.N.J.) (the "Securities Class Action").

## VI.   DERIVATIVE ALLEGATIONS

113.   Plaintiff brings this action derivatively and for the benefit of ELMS to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of ELMS, as well as the aiding and abetting thereof, gross mismanagement, and waste of corporate assets, and the Forum Defendants and Defendant Taylor and Luo's violations of Section 14(a) of the Exchange Act. Plaintiff also seeks contribution under Sections 10(b) and 21D of the Exchange Act from Defendants Taylor, Luo, Boris, Kiev, Li, and Song.

114.   Plaintiff is a stockholder of the Company and was a stockholder of the Company at the time of the transactions alleged herein. Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting their rights.

115.   Under the circumstances presented herein, demand is futile and, thus, excused.

### A.   Demand Upon Defendant Krzanich Is Excused

116.   Defendant Krzanich has served as an ELMS director since the completion of the Merger and as Chair of the Board since February 1, 2022.

60

117. Krzanich benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his election to the ELMS Board through the false and misleading statements and material omissions in the Proxy Statement.

118. Krzanich is beholden to and controlled by Defendant Luo, who is a controlling shareholder in the Company.[14] Therefore, Krzanich will not take action against Defendant Luo because this would jeopardize his lucrative position within the Company.

119. Krzanich, as a director of ELMS, was required to, but failed to: (1) implement and maintain an effective system of internal controls over financial reporting to ensure that the Company's financial statements were accurate and complete; (2) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (3) investigate and take action when presented with red flags evidencing that Defendant Taylor and Luo had made Improper Equity Transactions and that the Company had issued false and misleading

---

[14] The February 1, 2022 8-K states that, pursuant to a settlement agreement, Defendant Luo agreed to give up some of his holdings of Company stock, including six million shares of Company stock plus an additional amount cash and stock, at his option, totaling $10 million. However, despite his surrendering a portion of his holdings, Defendant Luo still retains significant holdings, and he continues to serve as a consultant to the Company as part of a two-year consultancy agreement in which he remains a limited observer on the Company's Board.

financial statements. Had Krzanich taken timely action the damage caused to ELMS could have been prevented or at least minimized.

120.    As a member of the Audit Committee, Krzanich had duties regarding oversight of the risks facing the Company, ensuring the accuracy of the Company's financial statements, and ELMS's compliance with relevant laws, rules, and regulations. Further, Krzanich had obligations to work with the external auditor and to investigate and determine the external auditor's independence. In light of BDO's involvement with the Improper Equity Transactions and the failure in the internal controls over financial reporting, Krzanich utterly failed to perform these essential duties.

121.    Moreover, Krzanich failed to uphold his additional obligations as a member of the Nominating and Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of ELMS's Corporate Governance Guidelines and Code of Conduct.

122.    Krzanich is neither disinterested nor independent. Any demand upon Defendant Krzanich is futile and, thus, excused.

### B.    Demand Upon Defendant McIntyre Is Excused

123.    Defendant McIntyre has been an ELMS director since the completion of the Merger and was appointed the Company's interim CEO and President on February 1, 2022. The Company provides McIntyre with her principal occupation

from which she receives substantial compensation, including $550,000 during fiscal year 2021 alone. Thus, McIntyre could not consider a demand for action that might require her to sue the directors that control her continued employment and/or fellow members of management with whom she works on a day-to-day basis.

124.   Further, upon her appointment as interim CEO and President, McIntyre received a restricted stock unit award with an aggregate value of $12,000,000. Therefore, McIntrye will not investigate and take action against those responsible for the wrongdoing because doing so would harm her and her investments. If McIntyre acknowledged that she, ELMS, or others engaged in misconduct, her investment in ELMS would be substantially devalued. Further, if McIntyre acknowledged that executives at ELMS had engaged in the wrongdoing alleged, she would be acknowledging that she, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

125.   McIntyre is beholden to and controlled by Defendant Luo, who is a controlling shareholder in the Company. Therefore, McIntyre will not take action against Defendant Luo because this would jeopardize her lucrative position within the Company.

126.   McIntyre benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing her election to the ELMS Board through the false and misleading statements and material omissions in the Proxy Statement.

127.    McIntyre, as a director of ELMS, was required to, but failed to: (1) implement and maintain an effective system of internal controls over financial reporting to ensure that the Company's financial statements were accurate and complete; (2) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (3) investigate and take action when presented with red flags evidencing that Defendant Taylor and Luo had made Improper Equity Transactions and that the Company had issued false and misleading financial statements. Had McIntyre taken timely action the damage caused to ELMS could have been prevented or at least minimized.

128.    McIntyre is neither disinterested nor independent. Any demand upon Defendant McIntyre is futile and, thus, excused.

### C.    Demand Upon Defendant Peretz Is Excused

129.    Defendant Peretz benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his election to the ELMS Board through the false and misleading statements and material omissions in the Proxy Statement.

130.    Peretz is beholden to and controlled by Defendant Luo, who is a controlling shareholder in the Company. Therefore, Peretz will not take action against Defendant Luo because this would jeopardize his lucrative position within the Company.

131.   Peretz, as a director of ELMS, was required to, but failed to: (1) implement and maintain an effective system of internal controls over financial reporting to ensure that the Company's financial statements were accurate and complete; (2) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (3) investigate and take action when presented with red flags evidencing that Defendant Taylor and Luo had made Improper Equity Transactions and that the Company had issued false and misleading financial statements. Had Peretz taken timely action the damage caused to ELMS could have been prevented or at least minimized.

132.   As Chair of the Audit Committee, Peretz had duties regarding oversight of the risks facing the Company, ensuring the accuracy of the Company's financial statements, and ELMS's compliance with relevant laws, rules, and regulations. Further, Peretz had obligations to work with the external auditor and to investigate and determine the external auditor's independence. In light of BDO's involvement with the Improper Equity Transactions and the failure in the internal controls over financial reporting, Peretz utterly failed to perform these essential duties.

133.   Peretz is neither disinterested nor independent. Any demand upon Defendant Peretz is futile and, thus, excused.

**D.    Demand Upon Defendant Goldberg Is Excused**

134.    Defendant Goldberg has served as an ELMS director since the completion of the Merger and served as a director of Forum from its IPO until the Merger. Goldberg receives an annual cash retainer of $100,000 and an annual grant of restricted stock units valued at $100,000 for his service as a director of the Company. Goldberg will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments. If Golberg acknowledged that he, ELMS, or others engaged in misconduct, his investment in ELMS would be substantially devalued and his lucrative position would be jeopardized. Further, if Goldberg acknowledged that executives at ELMS had engaged in the wrongdoing alleged, he would be acknowledging that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

135.    Goldberg is beholden to and controlled by Defendant Luo, who is a controlling shareholder in the Company. Therefore, Goldberg will not take action against Defendant Luo because this would jeopardize his lucrative position within the Company.

136.    Goldberg benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his election to the ELMS Board through the false and misleading statements and material omissions in the Proxy Statement.

66

137.   Goldberg is a member of Sponsor who beneficially owns 7,071,666 Class A ELMS common shares, representing voting control of 5.7%. Thus, Goldberg would not take action against the other members of ELMS's Board or the Company's management because it would jeopardize Sponsor's investment in ELMS.

138.   Goldberg, as a director of ELMS, was required to, but failed to: (1) implement and maintain an effective system of internal controls over financial reporting to ensure that the Company's financial statements were accurate and complete; (2) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (3) investigate and take action when presented with red flags evidencing that Defendant Taylor and Luo had made Improper Equity Transactions and that the Company had issued false and misleading financial statements. Had Goldberg taken timely action the damage caused to ELMS could have been prevented or at least minimized.

139.   As a member of the Audit Committee, Goldberg had duties regarding oversight of the risks facing the Company, ensuring the accuracy of the Company's financial statements, and ELMS's compliance with relevant laws, rules, and regulations. Further, Goldberg had obligations to work with the external auditor and to investigate and determine the external auditor's independence. In light of BDO's

involvement with the Improper Equity Transactions and the failure in the internal controls over financial reporting, Goldberg utterly failed to perform these essential duties.

140.    Goldberg is neither disinterested nor independent. Any demand upon Defendant Goldberg is futile and, thus, excused.

### E.    Demand Upon Defendant Boris Is Excused

141.    Boris served as Co-CEO, CFO and as a director of Forum from its inception until the Merger, whereupon he stepped down from his roles as Co-CEO and CFO and continued serving as a director of ELMS. If Boris acknowledged that executives at ELMS had engaged in the wrongdoing alleged, he would be acknowledging that he, as the Co-CEO and CFO of Forum and director of ELMS, either knew of the wrongdoing or should have known of the wrongdoing.

142.    As disclosed in the February 1, 2022 8-K, the Company has concluded that Boris does not qualify as an independent director pursuant to Nasdaq Listing Rule 5605(c)(2)(A)(ii) and, as such, removed him from the Audit Committee.

143.    Boris is beholden to and controlled by Defendant Luo, who is a controlling shareholder in the Company. Therefore, Boris will not take action against Defendant Luo because this would jeopardize his lucrative position within the Company

144.    Boris benefitted from the violation of Section 14(a) of the Exchange

Act pled herein by securing his election to the ELMS Board through the false and misleading statements and material omissions in the Proxy Statement.

145.   Boris is named as a defendant in the pending Securities Class Action. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

146.   By virtue of Boris's position as a managing member of Forum Capital Management III LLC, Boris is the beneficial owner of the 7,071,666 Class A ELMS common shares held by Sponsor, representing voting control of 5.7%. Thus, Boris would not take action against the other members of ELMS's Board or the Company's management because it would jeopardize his investment (through Sponsor) in ELMS and damage his reputation as a professional investor.

147.   Boris, as a director of ELMS, was required to, but failed to: (1) implement and maintain an effective system of internal controls over financial reporting to ensure that the Company's financial statements were accurate and complete; (2) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (3) investigate and take action when presented with red flags evidencing that Defendant Taylor and Luo had made Improper Equity Transactions and that the Company had issued false and misleading financial statements. Had Boris taken timely action the damage caused to ELMS

could have been prevented or at least minimized.

148.   Boris is neither disinterested nor independent. Any demand upon Defendant Boris is futile and, thus, excused.

**F.   Other Factors Demonstrating That Demand Upon the Individual Defendants Is Futile**

149.   ELMS has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

150.   The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

151.   Publicly traded companies, such as ELMS, typically carry director & officer liability insurance from which the Company could potentially recover some or all its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover ELMS's damages.

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duty

152.   The Individual Defendants owed and owe fiduciary duties to ELMS. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe ELMS the highest obligation of good faith and loyalty in the administration of ELMS's affairs. The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to ELMS alleged herein.

153.   The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their occurrence.

154.   The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties regarding prudently managing the business of ELMS in a manner consistent with the duties imposed upon them by law.

155.   By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of ELMS's affairs and in the use and preservation of ELMS's assets.

71

156.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, ELMS has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damages include, among other things, the costs of defending and resolving the pending securities class actions.

157.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

### SECOND CLAIM
**Against the Forum Defendants, Luo and Taylor for Violations of Section 14(a) of the Exchange Act**

158.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

159.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

160.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act,

provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

161. The Proxy Statement was false and misleading because the Forum Defendants failed to maintain proper internal controls over financial reporting and director compensation with the result that (i) certain of the Company's and ELMI's financial statements were false and unreliable; (ii) certain ELMI executives and/or directors had engaged in the improper equity transactions in which they purchased discounted equity without obtaining an independent valuation; (iii) the Company was forced to make a restatement of their financial statements leading to further upheaval at the Company; and (iv) the Company was named as a defendant in the Securities Class Action.

162. The false and misleading elements of the Proxy Statement led Forum shareholders to: (i) approve the Merger, the terms of which were unfavorable to Forum shareholders in light of the Improper Equity Transactions; (ii) reelect Defendants Boris and Goldberg to the Board, who had breached their fiduciary duties to the Company; (iii) elect Defendants Luo and Taylor to the Board, who had engaged in the improper equity transactions and who had aided and abetted the

breaches of fiduciary duty by Defendants Boris and Goldberg; (iv) elect Defendants McIntyre, Peretz, and Krzanich to the Board, who breached their fiduciary duties to the Company; (v) approve the issuance of more than 20% of the Company's issued and outstanding common stock; (vi) approve the Company's third amended and restated certificate of incorporation; (vii) approve and adopt, on a non-binding advisory basis, certain differences between the Company's former and the third amended and restated certificate of incorporation; and (viii) approve the Incentive Plan, allowing the Individual Defendants to receive unjust compensation.

163. The Company was damaged as a result of the Forum Defendants' and Taylor and Luo's material misrepresentations and omissions in the Proxy Statement.

164. Plaintiff, on behalf of ELMS, seeks relief for the damages inflicted upon the Company based on the misleading Proxy Statement in connection with the improper election of Defendants Boris, Goldberg, McIntyre, Peretz, Krzanich, Luo, and Taylor to the Board.

## THIRD CLAIM
**Against Defendants Boris, Luo, and Taylor, Kiev, Li, and Song for Contribution Under Sections 10(b) and 21D of the Exchange Act**

165. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

166. The Company and Defendants Boris, Luo, and Taylor, Kiev, Li, and

Song are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 21D of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Boris, Luo, and Taylor Kiev, Li, and Song's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

167.    Defendants Boris, Luo, and Taylor, Kiev, Li, and Song, because of their positions of control and authority, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

168.    Accordingly, Defendants Boris, Luo, and Taylor, Kiev, Li, and Song are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

169.    As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Boris, Luo, and Taylor, Kiev, Li, and Song.

## FOURTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

170.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

171.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the securities class actions lawsuits.

172.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

173.   Plaintiff on behalf of ELMS has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

174.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

175.   The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage and control the operations, business, and internal controls of the Company.

176.   The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law.

177.   During the course of the discharge of their duties, the Individual Defendants knew or disregarded the unreasonable risks and losses associated with their misconduct, yet they caused the Company to engage in the scheme complained of herein which had an unreasonable risk of damage to the Company, thus breaching their duties to the Company. As a result, the Individual Defendants grossly mismanaged the Company.

## SIXTH CLAIM
### Against Defendants Luo, Taylor, Li, and Song for Aiding And Abetting

178.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

179.   Luo and Taylor aided and abetted the Forum Defendants who breached their fiduciary duties to the Company.

180.   Luo, Taylor, Li, and Song's misconduct resulted in continuous, connected, and ongoing harm to the Company.

181.   Specifically, Luo, Taylor, Li, and Song promoted the Merger by issuing false and misleading statements concerning ELMI. Moreover, Luo, Taylor, Li, and

Song controlled and operated ELMI, the Company's operational predecessor, and caused ELMI to jointly issue financial statements which were incorporated into the Company's SEC filings and which contained materially false and misleading statements promoting the Company's business, operations, and prospects.

182. Moreover, Defendants Luo and Taylor, at least, engaged in the Improper Equity Transactions, which caused the Company to create a Special Committee and launch an investigation, and which further contributed to the Company's need to restate previously issued financial statements.

183. Taylor and Luo are jointly and severally liable to the same extent as the Forum Defendants are liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

184. As a direct and proximate result of Luo, Taylor, Li, and Song's aiding and abetting of the Forum Defendants' breaches of duty alleged herein, the Company has sustained and will continue to sustain substantial damages.

185. Plaintiff on behalf of the Company has no adequate remedy at law.

### SEVENTH CLAIM
### Against The Individual Defendants for Aiding and Abetting

186. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

187. Each of the Individual Defendants has acted and is acting with

knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

188.   In committing the wrongful acts, each of the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

189.   Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

190.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.

## VIII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of ELMS, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to ELMS;

(c)     Declaring that the Forum Defendants and Defendants Taylor and Luo violated Section 14(a) of the Exchange Act;

(d)     Declaring that the Individual Defendants have grossly mismanaged ELMS;

(e)     Determining and awarding to ELMS the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(f)     Directing ELMS to take all necessary action to reform and improve its compliance, internal control systems and corporate governance practices and procedures to protect the Company and its stockholders from a repeat of the damaging events described herein;

(g)     Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

(h)     Awarding to the Company restitution from Defendants, and each of them;

(i)    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(j)    Granting such other and further relief as the Court deems just and proper.

## IX.    JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: May 27, 2022                    By:

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive
Rochester, MI 48307
Telephone: (248) 841-2200
Email: epm@millerlawpc.com
           ssa@millerlawpc.com

David C. Katz
Mark D. Smilow
Joshua M. Rubin
**WEISS LAW**
305 Broadway, 7th Fl
New York, NY 10007
Telephone:  (212) 682-3025
Facsimile:  (212) 682-3010
Email: dkatz@weisslawllp.com
           msmilow@weisslawllp.com
           jrubin@weisslawllp.com

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Matis Nayman, hereby verify that I have held stock in Electric Last Mile Solutions, Inc. f/k/a Forum Merger III Corporation ("ELMS" or the "Company") since February 1, 2022. As such, I was a stockholder at the time of the transactions complained of in the Verified Stockholder Derivative Complaint ("Complaint"). I am ready, willing, and able to pursue this stockholder derivative action on behalf of ELMS. I have reviewed the allegations in the Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true. Having received a copy of the foregoing complaint, and having reviewed it with my counsel, I hereby authorize its filing.


matis nayman (May 17, 2022 12:06 EDT)

Matis Nayman